T.C. Memo. 2020-88

UNITED STATES TAX COURT

LETICIA C. SANTOS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27693-14.                    Filed June 17, 2020.

<u>Roger S. Davis</u>, for petitioner.

<u>Marie E. Small</u> and <u>Linda P. Azmon</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

ASHFORD, <u>Judge</u>:  This case is before the Court on a petition for

redetermination of employment status pursuant to section 7436.[1]  In a notice of

_____

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect at all relevant times, and all Rule references are to the Tax
Court Rules of Practice and Procedure.  Some monetary amounts are rounded to

(continued...)

[*2] determination of worker classification (notice of determination) issued to petitioner, respondent determined that (1) for purposes of Federal employment taxes,[2] the individuals listed in the notice of determination should be legally classified as petitioner's employees for all taxable periods of calendar years 2008-10 (periods at issue), (2) petitioner was not entitled to relief under the Revenue Act of 1978, Pub. L. No. 95-600, sec. 530, 92 Stat. at 2885, and (3) therefore petitioner was liable for Federal employment taxes of $125,799. The sole issue for decision is whether the individuals listed in the notice of determination should be legally classified as employees as respondent maintains or as independent contractors as petitioner maintains.[3] We resolve this issue in petitioner's favor.

---

[1](...continued)
the nearest dollar.

[2]For convenience, we use the term "Federal employment taxes" throughout this opinion to refer to the taxes imposed under the Federal Insurance Contributions Act (FICA), secs. 3101-3128, and the Federal Unemployment Tax Act (FUTA), secs. 3301-3311, and Federal income tax withholding, secs. 3401-3406.

[3]Petitioner failed to assign error in her petition to respondent's determination that she was not entitled to relief under the Revenue Act of 1978, Pub. L. No. 95-600, sec. 530, 92 Stat. at 2885. Accordingly, this issue is deemed conceded. See Rule 291(b)(4). In any event, in the light of our holding we need not address this issue.

**[*3]** FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by reference. Petitioner resided in Massachusetts when her petition was timely filed with the Court.

## I. Petitioner and Her Cleaning Business

Petitioner was born and raised in Brazil; she emigrated to the United States in 1996. In July 1998 she married Aguinaldo Santos. Sometime also in 1998 (or 1999) she began cleaning residential homes. In 2000 she began cleaning apartment buildings and the apartments within those buildings, and during at least the periods at issue until sometime in 2011 she owned and operated Campos Cleaning Co. (Campos Cleaning), an unincorporated business, to provide such cleaning services.[4] Mr. Santos also had his own cleaning business.

During at least the periods at issue Campos Cleaning had contracts with several apartment complexes to do "Unit Turnover Cleaning", i.e., cleaning

---

[4]Petitioner reported items of income and expense from Campos Cleaning on Schedules C, Profit or Loss From Business, attached to her Federal income tax returns for 2008-10. At a time not established by the record the Internal Revenue Service (IRS) examined petitioner's returns for 2008 and 2009. The examination resulted in petitioner's agreeing to certain income adjustments, including increased Schedule C gross receipts attributable to Campos Cleaning but also increased contract labor expenses attributable to Campos Cleaning. Petitioner sold Campos Cleaning in 2011.

[*4] recently vacated apartments for future tenant occupation, and contracts to clean the apartment complexes' common areas, i.e., the hallways and stairwells, laundry room, compactor area, fitness center, management offices, clubhouse, and model apartment. With respect to cleaning the common areas, the contracts specified the days and hours when such work was to be performed. That was not the case with respect to cleaning a recently vacated apartment; when a recently vacated apartment needed cleaning, the apartment complex's property manager would contact petitioner to schedule the cleaning. Although petitioner and Mr. Santos separated in 2002 and later divorced in 2010, he (and his business) by and large would handle cleaning the common areas on behalf of Campos Cleaning. Petitioner occasionally cleaned the recently vacated apartments herself, but by and large she hired others to clean these apartments. By sometime in 2009 she ceased performing any cleaning services herself because of health problems.

For cleaning the common areas the apartment complexes agreed to pay Campos Cleaning a weekly fixed amount ranging from $510 to $780. For cleaning any recently vacated apartment, they agreed to pay Campos Cleaning monthly at a fixed rate of $90-$120, depending on the size of the apartment.

Petitioner recruited individuals to work for Campos Cleaning through advertisements she posted in Brazilian hair salons and other businesses in Allston,

[*5] Massachusetts. She hired only individuals with previous cleaning experience and thus never provided any training to them.

Petitioner's workers did not have written employment contracts with Campos Cleaning. To that end, petitioner did not guarantee them a minimum amount or frequency of work and they could decline to do a cleaning job on behalf of Campos Cleaning for whatever reason. Many of petitioner's workers cleaned for other individuals or businesses as well.

Petitioner paid her workers weekly, and their pay was based on a fixed rate of $50-$70 per apartment cleaned, depending on the size of the apartment. Petitioner did not provide paid leave for sickness or vacation and did not offer health insurance, retirement benefits, or any other employee benefits (although the contracts between Campos Cleaning and the apartment complexes obligated Campos Cleaning to maintain commercial general liability insurance and workers' compensation insurance, an obligation with which Campos Cleaning complied).

When a recently vacated apartment needed cleaning, the apartment complex's property manager would contact petitioner, who would send one of her workers to do the cleaning by the deadline the property manager had established with her. By and large the workers that petitioner sent to do a cleaning job used their own or public transportation to get to the property, and they brought with

**[*6]** them and used their own cleaning supplies. They were also free to hire their own assistants; and if they did so they (not petitioner) were responsible for paying these assistants. Since most of her workers spoke only Portuguese or Spanish (languages that petitioner spoke), petitioner would relay to them any special instructions from the property manager.

Upon arriving at a property, the worker would be given a key to the apartment that needed to be cleaned and directed to that apartment by the property manager. Petitioner would rarely go to a property and supervise the cleaning, and once the cleaning was done, she would not go to the property and do a postcleaning inspection. If the cleaning was deficient in some respect and the worker had already left the property, the property manager would contact petitioner, and petitioner would then direct the worker to return to the property to remedy the problems. At no point did petitioner formally discharge or terminate any of her workers.

II.    Petitioner's Tax Reporting of the Workers and the Notice of Determination

Petitioner did not prepare (or have prepared) Forms W-2, Wage and Tax Statement, for any of her workers for 2008-10, Forms 941, Employer's Quarterly Federal Tax Return, for the periods at issue; or Forms 940, Employer's Annual

**[*7]** Federal Unemployment (FUTA) Tax Return, for 2008-10.  However, petitioner's accountant (the same individual who prepared and filed her Federal income tax returns for 2008 and 2009) prepared Forms 1099-MISC, Miscellaneous Income, for 26 workers for 2008, 17 workers for 2009 (for 10 of whom 2008 Forms 1099-MISC were prepared), and 5 workers for 2010 (for 1 of whom a 2009 Form 1099-MISC was prepared and 4 of whom 2008 and 2009 Forms 1099-MISC were prepared).  These forms were issued to those workers, but it is unclear whether copies of the forms were ever filed with the IRS.

At a time not established by the record the IRS notified petitioner that she (and Campos Cleaning) had been selected for employment tax examination.  On October 3, 2014, following this examination, the IRS issued to petitioner the notice of determination.[5]

---

[5]The notice of determination listed 11 individuals who should be legally classified as petitioner's employees for 2008 (not counting an individual who appears to have been erroneously listed twice), 12 individuals who should be legally classified as petitioner's employees for 2009, and 5 individuals who should be legally classified as petitioner's employees for 2010.  There was some overlap of the individuals listed for 2008-10; in total, 14 different individuals were listed in the notice of determination.  There were 19 individuals for which Forms 1099-MISC were prepared who were not listed in the notice of determination.

**[\*8]**                                    OPINION

I.     Burden of Proof

In general, the Commissioner's determinations set forth in a notice of

deficiency are presumed correct, and the taxpayer bears the burden of proving

otherwise.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  This

principle applies to the Commissioner's determinations that a taxpayer's workers

are employees.⁶  Ewens & Miller, Inc. v. Commissioner, 117 T.C. 263, 268 (2001)

(citing Boles Trucking, Inc. v. United States, 77 F.3d 236, 239-240 (8th Cir.

1996)).

II.    The Workers' Legal Classification

A.     Applicable Law

Employers and employees are subject to FICA while only employers are

subject to FUTA.  FICA provides for taxes denominated "[o]ld-age, survivors, and

disability insurance" and "[h]ospital insurance" payable by both employers and

------

⁶Under sec. 7491(a)(1) and (2), if the taxpayer produces credible evidence with respect to any relevant factual issue and meets certain other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue.  However, sec. 7491(a) does not apply to employment tax disputes (and petitioner does not argue otherwise).  Charlotte's Office Boutique, Inc. v. Commissioner, 121 T.C. 89, 102 (2003) (citing sec. 7491(a) and Joseph M. Grey Pub. Accountant, P.C. v. Commissioner, 119 T.C. 121, 123 n.2 (2002), aff'd, 93 F. App'x 473 (3d Cir. 2004)), supplemented by T.C. Memo. 2004-43, aff'd, 425 F.3d 1203 (9th Cir. 2005).

[*9] employees. See secs. 3101, 3111. FUTA provides for unemployment taxes payable by employers.[7] See secs. 3301-3311. Employers are required to withhold the employee's portion of FICA taxes as well as Federal income tax on wage payments they make to each employee.[8] See secs. 3102, 3402. These Federal employment taxes do not apply to payments to independent contractors.

Whether an individual is an employee or an independent contractor is a factual question to which common law principles apply. Weber v. Commissioner, 103 T.C. 378, 386 (1994), aff'd per curiam, 60 F.3d 1104 (4th Cir. 1995); see also sec. 3121(d)(2) (defining an employee as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee"); sec. 3306(i). The regulations provide guidance with respect to classifying a worker as a common law employee. Specifically, section 31.3121(d)-1(c)(2), Employment Tax Regs., provides for FICA tax purposes the following:

---

[7]Employers report (on Form 940) and pay FUTA tax on a calendar year basis. See sec. 3301; sec. 31.6011(a)-3(a), Employment Tax Regs.

[8]Employers report (on Form 941) and pay all FICA tax (i.e., the "employee" FICA tax and the "employer" FICA tax) as well as Federal income tax on wage payments on a quarterly basis. See sec. 3402(a); secs. 31.6011(a)-1(a)(1), 31.6011(a)-4(a)(1), Employment Tax Regs.; secs. 31.6011(a)-1T(a)(1), 31.6011(a)-4T(a)(1), Temporary Employment Tax Regs., 73 Fed. Reg. 79357, 79358 (Dec. 29, 2008).

[*10] Generally * * * [an employer-employee] relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished.  That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done.  In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so.  The right to discharge is also an important factor indicating that the person possessing that right is an employer.  Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services.  In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he [or she] is an independent contractor.  An individual performing services as an independent contractor is not as to such services an employee under the usual common law rules. * * *

Sections 31.3401(c)-1(b) and 31.3306(i)-1(b), Employment Tax Regs., use

virtually identical text to define an employer-employee relationship for Federal

income tax withholding and FUTA tax purposes, respectively.

Courts consider various factors in determining whether a worker is a

common law employee or an independent contractor.  Weber v. Commissioner,

103 T.C. at 387.  Relevant factors this Court considers include:  (1) the degree of

control exercised by the principal over the worker; (2) which party invests in the

work facilities used by the worker; (3) the worker's opportunity for profit or loss;

**[*11]** (4) whether the principal can discharge the worker; (5) whether the work is part of the principal's regular business; (6) the permanency of the relationship; and (7) the relationship the parties believed they were creating. Ewens & Miller, Inc. v. Commissioner, 117 T.C. at 270 (citing Weber v. Commissioner, 103 T.C. at 387). No single factor is dispositive, and all facts and circumstances must be considered.[9] Id.

---

[9]The U.S. Court of Appeals for the First Circuit, the court to which an appeal of this case would lie absent stipulation by the parties otherwise, see sec. 7482(b)(1)(A), endorses looking at similar nonexhaustive factors weighed in their totality as indications of an employer-employee relationship (in the context of disputes under Title VII of the Civil Rights Act of 1964). That court considers: (1) whether the employer has the right to control when, where, and how the worker performs the job; (2) the level of skill or expertise that the work requires; (3) whether the work is performed on the employer's premises; (4) whether there is a continuing relationship between the worker and the employer; (5) whether the employer has the right to assign additional projects to the worker; (6) whether the employer sets the hours of work and the duration of the job; (7) whether the worker is paid by the hour, week, or month rather than the agreed cost of performing a particular job; (8) whether the worker hires and pays assistants; (9) whether the work performed by the worker is part of the regular business of the employer; (10) whether the employer is in business; (11) whether the worker is engaged in his or her own distinct occupation or business; (12) whether the employer provides the worker with benefits, such as insurance, leave, or worker's compensation; (13) whether the worker is considered an employee of the employer for tax purposes; (14) whether the employer can discharge the worker; and (15) whether the worker and the employer believe that they are creating an employer-employee relationship. Casey v. Dep't of Health & Human Servs., 807 F.3d 395, 404-405 (1st Cir. 2015) (citing Lopez v. Massachusetts, 588 F.3d 69, 85 (1st Cir. 2009)); see also United States v. Powers, 702 F.3d 1, 11 (1st Cir. 2012) (discussing some of the common-law factors indicating an employer-employee

(continued...)

**[*12]** B.     <u>Analysis</u>

The extent to which the principal has the right to exercise control over the worker is the "crucial test" in determining the nature of a working relationship. <u>Weber v. Commissioner</u>, 103 T.C. at 387; <u>see also</u> <u>Casey v. Dep't of Health & Human Servs.</u>, 807 F.3d 395, 405 (1st Cir. 2015).  To that end, "[a]n employer-employee relationship exists when the principal retains the right to direct the manner in which the work is to be done, controls the methods to be used in doing the work, and controls the details and means by which the desired result is to be accomplished."  <u>Atl. Coast Masonry, Inc. v. Commissioner</u>, T.C. Memo. 2012-233, at *15 (citing <u>Ellison v. Commissioner</u>, 55 T.C. 142, 152-153 (1970)).

Respondent contends that petitioner had the requisite control over her workers to establish an employer-employee relationship because she managed the day-to-day operations of Campos Cleaning.  In support of this contention respondent points to the contracts between Campos Cleaning and the apartment complexes; more specifically, the requirements in the contracts that Campos Cleaning was responsible for all necessary labor, supervision, equipment, and materials needed to perform the delineated cleaning services, was not permitted to

---

[9](...continued)
relationship in the context of admissibility of IRS revenue agent testimony regarding Federal employment taxes ostensibly owing in a criminal tax case).

[*13] assign the contracts without the apartment complexes' prior written consent, and was responsible for maintaining certain minimum amounts of general liability insurance and worker's compensation insurance. Respondent also notes how petitioner was the "point of contact" for the property managers with respect to any cleaning job, including payment by the apartment complexes for any cleaning job. Petitioner contends that she did not control her workers in a manner that would establish an employer-employee relationship because she did not have the right to control the manner and means by which the cleaning work should be accomplished. We agree with petitioner.

Petitioner's role was more that of a dispatcher, acting as a financial and linguistic bridge or intermediary between her workers and the apartment complexes (and the property managers at those complexes). Petitioner directed her workers as to the result to be accomplished and expected the result to be done in accordance with the contracts' specifications and in turn to the satisfaction of the property managers, but she otherwise allowed her workers to use their discretion as to the means and methods of accomplishing this result. Petitioner credibly testified that her workers (all of whom were experienced cleaners in their own right and thus needed no training) did not have to take any cleaning job she offered them; and when they did take such a job, they by and large traveled to the

[*14] apartment complexes using their own or public transportation and performed the job at their own pace using their own cleaning supplies that they brought with them.[10]  Additionally, petitioner credibly testified that her workers were free to hire their own assistants and that they (not she) were responsible for paying these assistants.  Petitioner also credibly testified that she would relay to her workers any special instructions with respect to a cleaning job from an apartment complex's property manager because they by and large spoke only Portuguese or Spanish, languages that she also spoke, and she would rarely go to a property and supervise the cleaning or do a postcleaning inspection; the only "quality control" that she exercised was directing a worker after a cleaning job was finished and the worker had already left the property to return to the property if the property manager contacted her indicating that the cleaning was deficient in some respect.

Although the contracts obligated Campos Cleaning to maintain commercial general liability insurance and worker's compensation insurance (which it did), we do not find this to be definitive evidence that petitioner had the requisite degree of control over her workers.  These contracts governed only the relationship between

---

[10]We decide whether a witness' testimony is credible on the basis of objective facts, the reasonableness of the testimony, the consistency of the witness' statements, and the witness' demeanor.  Keels v. Commissioner, T.C. Memo. 2020-25, at *15-*16 (and cases cited threat).

**[\*15]** Campos Cleaning and the apartment complexes; they had no legal bearing on petitioner's relationship with her workers. Cf. Prof'l & Exec. Leasing, Inc. v. Commissioner, 89 T.C. 225, 233 (1987) ("A contract purporting to create an employer-employee relationship will not control where the common law factors (as applied to the facts and circumstances) establish that the relationship does not exist."), aff'd, 862 F.2d 751 (9th Cir. 1988).

Furthermore, although petitioner maintained consistent relationships with some of her workers spanning the periods at issue, most appear to have been limited--some working for Campos Cleaning for only one year (2008 or 2009). Only 3 of the 14 workers listed in the notice of determination worked for Campos Cleaning during 2008-10, and 8 of the 14 workers listed in the notice of determination worked for Campos Cleaning for either 2008 and 2009 or 2009 and 2010. Indeed, petitioner did not guarantee her workers a minimum amount or frequency of work and many of them cleaned for other individuals or businesses as well, making it unnecessary for her to ever formally discharge or terminate any of them. We thus view her relationship with her workers as more of a transitory one. See Kurek v. Commissioner, T.C. Memo. 2013-64, at \*13 (citing Ewens & Miller v. Commissioner, 117 T.C. at 273, John Keller, Action Auto Body v.

**[\*16]** <u>Commissioner</u>, T.C. Memo. 2012-62, slip op. at 13, and <u>Atl. Coast Masonry,</u>

<u>Inc. v. Commissioner</u>, at \*19).

Finally, given that Forms 1099-MISC were prepared for a total of 33

workers for 2008-10 (and no Forms W-2 and Forms 940 were prepared for those

years as well as no Forms 941 for the periods spanning those years) and on the

basis of her credible testimony and the credible testimony of one of the three

workers who worked for Campos Cleaning during each of these years, petitioner

certainly thought she was creating independent contractor relationships with her

workers.  See <u>Kurek v. Commissioner</u>, at \*14; <u>John Keller, Action Auto Body v.</u>

<u>Commissioner</u>, slip op. at 13-14.

On the basis of the record before us and looking at the totality of the

circumstances we conclude that no employer-employee relationship existed

between petitioner and her workers.  Accordingly, we hold that the individuals

listed in the notice of determination were independent contractors and petitioner is

not liable for the Federal employment taxes as determined by the IRS for the

periods at issue.

We have considered all of the arguments made by the parties and, to the

extent they are not addressed herein, we find them to be moot, irrelevant, or

without merit.

**[\*17]** To reflect the foregoing,

<u>Decision will be entered for</u>

<u>petitioner</u>.
